FILED

2003 MAR -6 P 2:20

CLERK. US DIST. COURT
EASTERN DIST. OF CALIF
AT FRESNO
BY ______ DEPUTY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR YAMAMOTO, BY AND THROUGH HIS Guardian ad Litem HUGO YAMAMOTO<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, TENET HEALTHCARE CORPORATION, DOCTORS MEDICAL CARE OF MODESTO, ANDREW JARAMILLO, M.D., PATTERSON HOSPITAL DISTRICT, MAXINE INGRAM, M.D.<br><br>Defendants. | CIV F-00-5588 OWW/SMS<br><br>MEMORANDUM DECISION AND ORDER RE: DEFENDANT TENET HEALTHSYSTEM HOSPITALS, INC.'S MOTION FOR SUMMARY JUDGMENT; DEFENDANT UNITED STATES OF AMERICA'S MOTION TO STRIKE |

Before the court is defendant Tenet Healthsystem Hospitals, Inc.'s,[1] motion for summary judgment, filed November 18, 2002, against plaintiff Hector Yamamoto on the Medical Negligence Issue. Doc. 106 filed November 8 at 2:1-6. Plaintiff Yamamoto opposes this motion. Opposition Brief, Doc. 108, and Declaration of Dr. MacQuarrie, Doc. 107 filed Nov. 8, 2002. Defendant United States of America moves to strike three paragraphs of Dr.

[1] Tenet Healthsystems Hospitals, Inc., dba Doctors Medical Center-Modesto, indicates in its moving papers it is erroneously referred to as Tenet Healthcare Corporation and Doctors Medical Care of Modesto. Tenet's correct designation is used in this Order.



119

MacQuarrie's declaration from plaintiff's opposition brief. Doc. 108 at 1-2, filed November 18, 2002. Oral arguments were heard November 25, 2002.

## I. BACKGROUND

Plaintiff, four year old Hector Yamamoto, received emergency medical care from Tenet Healthsystems Hospitals, Inc. (Tenet) (dba Doctors Medical Center-Modesto) on Dec. 5, 1997. Plaintiff's Second Amended Complaint alleges: negligence; failure to obtain informed consent, and; negligent selection and retention of staff physician. *See* Doc. 43. Through his Guardian ad Litem, plaintiff contends the medical care he received at Tenet caused plaintiff to become "profoundly brain-damaged, blind, [and] spastic quadriplegic." Doc. 106 at 1. Defendant Tenet denies all allegations of substandard care and moves for summary judgment.[2] Doc. 87. Plaintiff opposes this motion. Docs. 106-107. Defendant United States of America moves to strike three paragraphs of Dr. MacQuarrie's declaration from plaintiff's opposition brief. Doc. 108 at 1-2.

## II. LEGAL STANDARD

---

[2] Defendant fails to indicate whether it moves for summary judgement on all three of plaintiff's claims or only one or two of plaintiff's claims. Defendant's arguments are directed solely at the negligence claim; therefore this motion is treated only as one for summary adjudication as to the negligence claim. (*see* First Cause of Action, Doc. 43 at 7).

A. Summary Judgment

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir.2001), *amended by* 2001 WL 1490998 (9th Cir.2001).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the

complaint. *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

B. Motion to Strike

Rule 12(f) provides that "redundant, immaterial, impertinent, or scandalous matters" may be "stricken from any pleading." Fed. R. Civ. P. 12(f); *United States v. Crisp*, 190 F.R.D. 546, 551 (E.D. Cal. 1999) (quoting *Monroe v. Board of Educ.*, 65 F.R.D. 641, 645 (D. Conn. 1975) ("[A] motion to strike has sometimes been used to call to courts' attention questions about the admissibility of proffered material in [ruling on motions.]" (citations omitted)). Motions to strike are disfavored and infrequently granted. *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F.Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Assocs. v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir.1993). Such motions should be granted only where it can be shown that no evidence in support of an allegation is admissible. *Id.*

## III. ANALYSIS

### A. Motion for Summary Judgment

Defendant Tenet contends it has no liability because Plaintiff was allegedly in a deteriorating physical condition before he was admitted. Defendant alleges plaintiff suffered a Code Blue, which medical care could not have avoided, and received diligent medical care, but could not be safely revived. Defendant incorrectly asserts plaintiff is required to "establish a *prima facia* case for medical malpractice by establishing duty, breach, causation and damages" in order to defeat defendant's Summary Judgment motion. Doc. 87 at 2-4. The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thus, it is defendant's burden to show an absence of evidence to support the nonmoving party's case. It is not the plaintiff's burden to prove its prima facia case at this juncture.

Defendant contends it is entitled to summary judgment after presenting expert evidence that its conduct "fell within the

community standard of care" unless "the plaintiff comes forward with conflicting expert evidence." *Id.* at 3 citing *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir.1988); *Landeros v. Flood*, 17 Cal. 3d 399, 410 (1976); *Simone v. Sabo*, 37 Cal.2d 253, 257 (1951). Defendant's motion for summary judgment relies entirely upon four expert opinions[3] submitted with its motion and concludes: "because there was no medical negligence by legal definition, plaintiff cannot sustain the cause of action against [defendant]." Doc. 87 at 6. The four expert opinions are identical, except for the expert's background and qualifications, and aver:

> (a) The care and treatment that was provided to the plaintiff . . . while he was a patient there on December 5, 1997, was reasonable, appropriate and complied with the required standards of care for examining and treating patients such as the plaintiff.
>
> (b) The care and treatment that the plaintiff received . . . was not negligent and did not breach the required standards of care for a hospital.

Plaintiff replies that his expert provides a catalog of defendant's medical errors. Plaintiff offers a detailed

---

[3] The experts are: Dr. Robert H. Dailey, Dr. Paul G. Fisher, Dr. Timothy E. Albertson, and Dr. Greg Hammer. Each expert submits an extensive Curriculum Vitae (CV). The CV's show sufficient knowledge, education and experience to qualify each physician to give opinion testimony in the applicable field of medicine, emergency medicine, and pediatric neurology, and pulmonary and critical care medicine.

declaration by Dr. Michael MacQuarrie[4] describing how, why and when Tenet's physician and staff breached the applicable standard of care. Dr. MacQuarrie explicates:

> "9. Hector arrived at Doctors Hospital at 3:09 p.m. There, he was seen in the emergency room by Andrew Jaramillo, M.D.... Hector was alert having considerable difficulty breathing and was febrile with a temperature of 38.1 [degrees Celsius]. He was grunting. His oxygen saturation was 89-90%. His mucous membranes were moist and his neck was flexed. There was dullness to percussion on the right side and very diminished breath sounds on the right. The left side had rales, rhonchi, and some wheezes. His abdomen was distended, with a mass present and an enlarged liver and spleen. His WBC count was 16,500. An initial (portable) chest x-ray taken at 3:27 p.m. in the ER, showed a space-occupying mass or fluid occupying the right hemithorax and severely displacing the mediastinum and heart to the left. An ultrasound was suggested. Hector was intubated at 3:55 p.m. because of worsening respiratory distress. It was recognized as a right main stem intubation and the tube was pulled back. A second (portable) chest X-ray was

---

[4] Dr. MacQuarrie includes his CV, which shows knowledge, education and experience sufficient to qualify him as an expert able to give opinion testimony in the applicable fields of internal medicine, emergency medicine, critical care, advanced trauma life support, cardiac life support, and paramedic and EMT training.

taken in the ER at 4:00 p.m. This X-ray was taken post intubation. The heart and mediastinum remain markedly shifted toward the left. There was now lucency in the right chest extending from the midline, raising the possibility of pneumothorax secondary to barotrauma. The reviewing radiologist suggested further films be taken and that the insertion of a chest tube be considered. The radiologist notes that these findings were discussed with Dr. Jaramillo at 5:15 p.m. An Ultrasound was performed between 4:38 p.m. and 4:50 p.m. and indicated either a large mass versus complex fluid collection occupying essentially the entire right chest. The radiologist thought that this could represent a huge hemothorax, empyema, or unusual neoplasm. The Respiratory Care note for 4:50 p.m. indicates that the therapist found it very difficult to manually ventilate Hector and was unsuccessful in placing Hector on mechanical ventilation. A CT chest scan taken at 5:36 p.m. showed evidence of a large right-sided pleural effusion, probable empyema and evidence of a right pneumothorax.

10. When Hector was brought back from CT, Dr. Jaramillo thought that Hector was deteriorating and asked that a surgeon (Milligan) and a pediatrician (Brown) be called. Dr. Brown's chart note indicates that she was called at 6 p.m. Hector went into respiratory arrest (coded) at 6:28 p.m., three hours and 20 minutes after

arrival at the Emergency Department. *After coding*, Dr. Jaramillo placed a needle in Hector's chest which revealed pus. Preparations were thereafter made by Dr. Jaramillo to place a chest tube. At that moment, Dr. Milligan arrived and took responsibility for placing the chest tube. According to Dr. Milligan, over 1000 cc of empyema was drained. After approximately 30 minutes of resuscitation efforts, Hector developed a pulse on his own. His blood pressure was low and he continued to have difficulty breathing. A large pneumothorax was present on the left pcr X-ray and the ET tube was found to be in the right main stem. Hector improved after this was corrected. Hector suffered an hypoxic-ischemic brain injury.

12. Based upon my review of the medical records as well as my education, background, experience and training, it is my opinion that Hector Yamamoto was inappropriately evaluated and treated at Doctors Hospital/Medical Center by Dr. Jaramillo and hospital personnel. *After the initial x-ray had been taken in the ER and reviewed, a reasonably prudent and competent Emergency Medicine physician would have immediately placed a needle in Hector's right chest, in order to verify the cause of the "white-out" shown on the x-ray, that is, whether it was fluid or mass.* It would have also relieved the pressure displacing the mediastinum to the left. It was highly unlikely that the "white-

out" represented a mass or unusual neoplasm lesion in the right chest, since Hector was only four years old and had been in good health until a few weeks prior to his hospitalization (during which time he was being treated for a respiratory infection). Most likely, the "white-out" represented fluid in Hector's right chest. After placing a chest needle and verifying that there was fluid present in the right hemithorax, *a reasonably prudent and competent Emergency Medicine physician would have placed a chest tube in the right side and drained the fluid. Every competent ER physician knows how to do these procedures. In fact, paramedics are taught to do this needle procedure in the field, without the benefit of x-rays, in situations like Hector's.* This is done on the *mere suspicion of fluid or air under pressure!* It is a simple procedure, with few complications and one of the basic procedures of emergency airway management. *In addition, every competent Emergency Physician is well aware of the necessity to decompress the chest immediately. It is below the standard of care to even wait for further x-ray [and certainly to wait for any other imaging study to be performed], once the air and/or fluid under pressure is recognized.* Had the simple basic procedure been performed, as it should have been, immediately after the first x-ray, there would have been no need for the intubation at all! *The intubation was actually contraindicated without first decompressing the chest.*

*13.* The *improper placement and maintenance* of the endotracheal tube in the right mainstream Bronchus *most likely caused the tension pneumothorax.* The copious amounts of empyema *in conjunction with the tension pneumothorax caused a significant decrease in cardiac output, resulted in cardiopulmonary arrest and deprivation of oxygen to Hector's brain.* This, in turn, caused the pronounced hypoxic-ischemic brain injury. *None of this would have happened if appropriate care had been rendered as mentioned in the previous paragraph.* There were several opportunities and ample time between the first chest x-ray at 3:27 p.m., and a respiratory arrest 3 hours later at 6:28 p.m., to perform these procedures. In addition, there was absolutely no downside risk of performing either the needle thoracostomy or the placement of a chest tube.

14. Hector's tragic outcome could and should have been avoided by the performance of very basic emergency physician skills: the timely placement of a chest needle and tube. It should be noted that Dr. Jaramillo had formal training in surgery as an intern and is certified in ATLS, which includes chest tube placement and the demonstration of confidence in the management of needles and chest tubes for the treatment of both fluid (empyema) and the pneumothorax. Therefore it was inappropriate and totally unnecessary for him to wait

for a surgical consult.

Doc. 107 ¶¶ 9-15 at pp. 5-8. (Emphases added).

Dr. MacQuarrie's declaration outlines the multiple instances of breach of the standard of care including: the time delay between when Hector was first admitted and when a chest tube was finally used to remove the fluid; the opinion that even paramedics know the appropriate procedure which is used upon the mere suspicion of fluid in the lungs; the fact that all three scans done between 3:30 and 5:30 indicated that *something* was occupying a space in Hector's lungs, yet no one at Doctor's Hospital did anything to deal with this until after a surgical consult was called at 6:00 p.m. and Hector coded at 6:28 p.m.; the possibility that the *improper placement and maintenance* of the endotracheal tube in the right mainstream Bronchus *most likely caused the tension pneumothorax* which in turn caused Hector to code; the fact that the Doctor's Hospital Radiologist informed Dr. Jaramillo at 5:15 that he should consider inserting a chest tube, yet he did nothing until 6:00 when he finally called for a consult, which Dr. MacQuarrie alleges was unnecessary as Dr. Jaramillo had appropriate training to deal with the empyema. The expert opines that *every competent Emergency Physician is well aware of the necessity to decompress the chest immediately and that it is below the standard of care to even wait for further x-rays [and certainly to wait for any other imaging study to be performed], once the air and/or fluid under pressure is recognized; the opinion that intubation* was actually *contraindicated* without first decompressing the chest.

Dr. MacQuarrie opines: "this is not a situation where

medical personnel made a split-second judgment using their best efforts and simply had an unfortunate result . . . the repeated breaches of care Hector suffered unfolded over *three hours*." Doc. 106 at 8. Plaintiff argues a simple paramedic (with only a few months or a year of medical training) could have correctly treated Hector and avoided his injuries. *Id.* Plaintiff contends the three hour time window in which he received substandard care is further evidence that there was ample time for the hospital to provide competent medical intervention to avert the injuries suffered.

Defendant replies that plaintiff "fails to state any specific act or omission on the part of Doctors Medical Center which fell below the standard of care." Doc. 109 at 2:2-3. Defendant also contends plaintiff's expert declaration "fails to establish any act or omission on the part of Doctors Medical Center that specifically caused the plaintiff's present unfortunate condition for which he claims damages." *Id.* at 2:4-6. Defendant argues Dr. MacQuarrie's opinion fails to state what the "reasonably prudent and competent *hospital staff member* would have done." *Id.* at 3. Defendant "rests its denial of liability upon the declarations of Dr. Robert Daily, Dr. Paul Fisher, Dr. Timothy Albertson, and Dr. Greg Hammer." *Id.* at 2:7-8.

Defendant is correct in that Dr. Macquarrie does not identify whether the reviewing radiologist is a hospital staff member and whether he or she should have done something different. Dr. Macquarrie does not identify whether the respiratory therapist, presumably a hospital staff member, should have done something different. Dr. Macquarrie does not identify

any attending hospital staff, nor what she or he what should have done in the presence of Dr. Jaramillo's allegedly obvious incompetent care. It is unclear from Dr. Macquarrie's statement and plaintiff's response, whether Dr. Jaramillo or some other person incorrectly placed the endotracheal tube in the right mainstream bronchus. Dr. Macquarrie does attribute the allegedly incompetent care in general to "Dr. Jaramillo and Doctors Hospital/Medical Center." From plaintiff's evidence, it is reasonably inferred that defendant hospital owned and controlled the emergency room, employed the ER treating physician, Dr. Jaramillo, and was responsible for his hiring, supervision, and performance. Based on the McQuarrie declaration, no reasonable hospital emergency room would have provided the treatment plaintiff received.

Plaintiff's second amended complaint avers, "on or about December 5, 1997, and thereafter, the defendants Dr. Jaramillo, California Emergency Physicians, Dr. Jesse Kahn, and Dr. Thomas Rhodeman and other agents and employees of Doctors Medical Center of Modesto... undertook to provide medical and surgical care to the minor plaintiff, Hector Yamamoto." Doc. 43 ¶ 25 at 7. "The defendants, and each of them, were careless and negligent in their medical care of the plaintiff, and as a direct and legal result of said negligence of the defendants, and each of them, plaintiff suffered injuries as hereinafter set forth." Doc. 43 ¶ 26 at 7.

Plaintiff anticipated the hospital would attempt to disclaim liability for its physician's actions by arguing in its reply brief that its physicians (i.e. Dr. Jaramillo, et. al.) were not

hospital employees. Plaintiff's opposition brief argues: (1) "it would be improper to raise [this argument] for the first time in Reply papers; (2) the MacQuarrie declaration clearly attributes the errors to both Dr. Jaramillo and 'hospital personnel;' (3) the argument is squarely contrary to California law."

Citing *Mejia v. Community Hospital of San Bernardino*, plaintiff claims a California appeals court has held a medical facility liable because a non-employee doctor was nonetheless the ostensible agent of the facility. Doc. 106 at 7 n. 2 citing *Mejia*, 99 Cal.App.4th 1448, 1459-60 (2002). Plaintiff incorrectly interprets this case. The appellate court did not hold the hospital vicariously liable for the non-employee physician's acts as an "ostensible agent." The appellate court simply reversed the lower court's grant of a non-suit and held the plaintiff "alleged sufficient evidence *to get to the jury merely by claiming that she sought treatment at the hospital.*" *Melia*, 99 Cal.App.4th at 1460 (emphasis added). The error is not fatal. Plaintiff's first two points are well taken; it is prejudicial for defendant to raise a new argument for the first time in its reply brief. Plaintiff must be afforded further opportunity to address defendant's argument that defendant is not liable because the physicians are independent contractors or non-agents of the hospital.

Defendants argue that, "in California, when a defendant moves for summary judgment and supports his motions with expert declarations that his conduct fell within the community standard of care, the defendant is entitled to summary judgment unless the

plaintiff sets forth conflicting expert evidence." Doc. 109 at 3 citing *Huchison v. U.S.*, 838 F.2d 390, 392 (9th Cir.1988). Plaintiff has offered conflicting evidence in a detailed declaration from a qualified expert physician, describing the actions and inactions on the part of Tenet and Dr. Jaramillo including: the time delay between when Hector was first admitted and when a chest tube was finally used to remove the fluid; the contention that even paramedics know the appropriate procedure which is used upon even the mere suspicion of fluid in the lungs; the fact that all three scans done between 3:30 and 5:30 indicated that *something* was occupying a space in Hector's lungs, yet no one at Doctor's Hospital did anything to deal with this until after a surgical consult was called at 6:00 p.m. and Hector coded at 6:28 p.m.; the possibility that the *improper placement and maintenance* of the endotracheal tube in the right mainstream Bronchus *most likely caused the tension pneumothorax* which in turn caused Hector to code; the fact that the Doctor's Hospital Radiologist informed Dr. Jaramillo at 5:15 that he should consider inserting a chest tube yet Dr. Jaramillo did nothing until 6:00 when he finally called for a consult, which Dr. MacQuarrie alleges was unnecessary as Dr. Jaramillo had appropriate training to deal with the empyema; the opinion that *every competent Emergency Physician is well aware of the necessity to decompress the chest immediately and that it is below the standard of care to even wait for further x-ray [and certainly to wait for any other imaging study to be performed], once the air and/or fluid under pressure is recognized;* Dr. MacQuarrie's opinion that intubation was actually *contraindicated*

without first decompressing the chest. *See supra* pp. 6-12. Dr. MacQuarrie's testimony contradicts defendant's experts and establishes triable issues of material fact on the negligence issue.

Defendant's argument that Dr. MacQuarrie's opinions address "no hospital staff" actions directly, does not negate the substance of the opinions as to medical performance and attending hospital staff. Dr. MacQuarrie's statements include Dr. Jaramillo, "the reviewing radiologist," "the Respiratory Care therapist," and, "hospital personnel." Plaintiff is not required to prove his prima facia case by a preponderance of the evidence at the summary judgment stage. On summary judgment, the moving party (Tenet) bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir.2000). Here, the hospital provided the emergency room, the ER physician, and all medical services required for Hector's treatment.

Defendant, as the moving party, has not met its initial burden. Defendant's expert declarations offer no more than conclusions of law and do not address the specific criticisms of Hector's medical care. Defendant has not demonstrated the absence of a genuine issue of material fact. *See Devereaux, supra*, 263 F.3d at 1076. While Plaintiff's expert does not

identify by name responsible Doctor's Hospital staff members, he does specifically address "act[s] or omission[s] on the part of Doctors Medical Center [attending staff, Dr. Jaramillo, the radiologist, and the respiratory care therapist] which fell below the standard of care [and] caused the plaintiff's present unfortunate condition for which he claims damages." Plaintiff offered to provide fuller detail in a supplemental brief submission, which specifically identifies those employees of Doctor's Hospital whose acts or omissions fell below the standard of care, including attending staff, the respiratory care therapist, and as to whether Dr. Jaramillo or the radiologist were employees or agents of the hospital.

Final decision on this Summary Judgment motion is deferred, pending receipt within ten (10) days following the date of service of this decision, of the supplemental information.

B. <u>Defendant United States' Motion to Strike</u>

Defendant United States objects to paragraphs 6, 7 and 8 of Dr. MacQuarrie's declaration (Doc. 107) as inadmissible and irrelevant in relation to defendant Tenet's Motion for Summary Judgment. *See* Doc. 108. Paragraphs 6, 7 and 8 address the care Golden Valley Health Center provided Hector Yamamoto and pertains to the liability of defendant United States. Doc. 107, ¶¶ 6-7 at 3-5. The United States argues the opinions are irrelevant to the Summary Judgment Motion by Tenet, which has no legal connection to Golden Valley Health Center. Doc. 108 at 1. The United States also argues the opinions contained in paragraph 6, 7 and 8 are not expressed in Dr. MacQuarrie's expert witness report,

submitted pursuant to Fed. R. Civ. P. 26(a)(2)(B). Doc. 108 at 2. The United States contends plaintiff has not sought leave from the court to supplement or modify the expert report of Dr. MacQuarrie and has "tried to slip it in as a superfluous matter on another party's motion for summary judgment." *Id.* (at oral argument Plaintiff expressed no opposition to the motion to strike).

Paragraphs 6,7 and 8 of Dr. MacQuarrie's declaration are irrelevant in relation to the motion under consideration and are therefore stricken for this motion. However, defendants misstate the Federal Rules of Civil Procedure. Plaintiff is not required to seek leave of the court to supplement or modify the expert report. Under Federal Rule of Civil Procedure 26(e)(1), each party is required to supplement its expert's report[s] or its expert's deposition[s] as soon as the party learns of material changes or additions.[5] Such additions must be disclosed at least

---

[5]Federal Rule of Civil Proceedure 26(e)(1) states:

> A party is under a duty to supplement at appropriate intervals its disclosures under subdivision [26](a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report into information provided through deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under rule 26(a)(3) are due.

30 days before trial. (*See* Fed. R. Civ. P. 26(a)(3)). No trial date is currently set; plaintiff is required to supplement his expert testimony with information related to paragraphs 6, 7 and 8 of Dr. MacQuarrie's declaration (Doc. 107).

## IV. CONCLUSION

A. Defendant Tenet's Motion for Summary Judgment as to the Medical Negligence claim is DENIED to the extent Dr. Jaramillo and the respiratory therapist were acting for the hospital in providing emergency care;

B. Plaintiff shall submit any supplemental information which identifies staff within ten (10) days following the date of service of this decision.

C. Defendant United States of America's motion to strike paragraphs 6, 7 & 8 from Dr. MacQuarrie's declaration (Doc. 7) is GRANTED.

SO ORDERED.

DATED: ~~February~~ March 6, 2003.

Oliver W. Wanger
UNITED STATES DISTRICT JUDGE

tel

United States District Court
for the
Eastern District of California
March 7, 2003

* * CERTIFICATE OF SERVICE * *

1:00-cv-05588

Yamamoto

v.

USA

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on March 7, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

OWW SMS

Donald J Sullivan
44 Montgomery Street
Suite 1050
San Francisco, CA 94104

Linda Anderson
United States Attorney's Office
1130 O Street
Room 3654
Fresno, CA 93721

B John Briegleb
Dummit Faber Briegleb and Diamond
1661 Garden Highway
Suite 100
Sacramento, CA 95833-9706

Rachelle C Sanchez
Riggio Mordaunt and Kelly
2509 West March Lane
Suite 200
Stockton, CA 95207

Michael R Mordaunt
Riggio Mordaunt and Kelly
2509 West March Lane

Suite 200
Stockton, CA 95207

James M Nelson
Donnelly and Nelson
2401 Shadelands Drive
Suite 120
Walnut Creek, CA 94598-2493

Jack L. Wagner, Clerk

BY: ______________________
Deputy Clerk